IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 03-cv-00140-MSK-CBS

ZEBEDEE E. HALL,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER,
THE DENVER SWAT TEAM, [known and unknown] members of,
SGT. BERDAHL #86059,
TECH. CANINO #91041,
TECH. GROTHE #95015,
TECH. GILWORTH #89044,
TECH. DELMENICO #89029,
TECH FOX #87026,
TECH BRODEN #90026,
TECH. MOEN #91027,
TECH. LAURITA #83011,
TECH. MCKIHHEN #86042,
TECH. TITUS #93013,
TECH. MEYER #89041,
TECH. BRENNAN #95035,
OFC. NEBEL #97015, and
SGT. ORGAN #75033,

    Defendants.
_____

**OPINION AND ORDER DENYING MOTION FOR NEW TRIAL**
_____

**THIS MATTER** comes before the Court pursuant to the Plaintiff's *pro se* Motion for

New Trial **(# 138)**. No response was filed by the Defendants.[1]

---

[1] On November 8, 2005, the Plaintiff filed a Motion for Order to Grant Motion for New Trial **(# 145)**, noting the Defendants' lack of response and requesting that his motion be deemed confessed. However, the lack of a response by the Defendants does not automatically entitle the

## **BACKGROUND**

The Plaintiff asserts a single claim: that the Defendants' failure to knock and announce before entering his home to execute a warrant on June 15, 2001 violated his rights under the 4th Amendment to the United States Constitution, entitling him to damages under 42 U.S.C. § 1983. The Court conducted a two-day bench trial on August 30 and 31, 2005 **(# 131, 133)**. The *pro se* Plaintiff, who is incarcerated, appeared live via a video connection at the prison. At the conclusion of the second day of trial, the Court recessed, then reconvened and delivered an oral ruling, finding that the Plaintiff had failed to carry his burden of establishing that the Defendants did not knock and announce prior to entering the home, and that it was more likely than not that such knocking and announcing took place. Consistent with its ruling, on August 31, 2005, the Court entered Judgment **(# 132)** in favor of the Defendants.

On September 7, 2005, the Plaintiff filed a timely Notice of Appeal **(# 134)**. One week later, the Plaintiff filed the instant Motion for a New Trial **(# 138)**. He requests a new trial on six grounds: (i) that the Court should have appointed counsel to assist him; (ii) that the Plaintiff was prevented from subpoenaing two witnesses; (iii) that newly-discovered evidence indicated that the Defendants' testimony was perjured; (iv) that prison officials delayed the Plaintiff's receipt of mail, thereby preventing him from issuing trial subpoenas$^2$; and (v) the Court misinterpreted the evidence; and (vi) defects in the video hookup resulted in the Court mis-hearing the Plaintiff's testimony.

---

Plaintiff to the relief he requests. The Court will deem the Plaintiff's contentions unrebutted, but must nevertheless determine whether those unrebutted contentions warrant the relief requested.

$^2$This issue essentially duplicates issue (ii), and the Court will not analyze it separately.

2

## JURISDICTION

The Court had subject-matter jurisdiction to hear the Plaintiff's claims pursuant to 28 U.S.C. § 1331.

This Court assumes that it has jurisdiction to consider the Plaintiff's instant motion, notwithstanding the fact that his Notice of Appeal, filed a week earlier, effectively divested this Court of jurisdiction over the case. *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). Although this Court believes that the text of the Fed. R. App. P. 4(a)(4) itself does not compel the conclusion, the committee notes to the 1993 Amendments to that rule indicate that the rule is intended to operate such that "a notice [of appeal] filed before the filing of one of the specified motions . . . is, in effect, suspended until the motion is disposed of." The 10th Circuit's Order of March 17, 2006 **(# 147)**, stating that "The filing of this timely Rule 59(e) motion suspended the finality of the district court's August 31, 2005 Judgment" further appears to indicate that the Court of Appeals believes that this Court retains jurisdiction to consider the Plaintiff's post-appeal motion.

## ANALYSIS

### A. Standard of review

The Court grants relief under Fed. R. Civ. P. 59(e) only to correct manifest errors of law or to permit consideration of newly discovered evidence. *Loughridge v. Chiles Power Supply Co.,* 431 F.3d 1268, 1274-75 (10th Cir. 2005). To constitute newly-discovered evidence under this rule, the movant must show that the evidence is newly-discovered and, if the evidence was available at the time of the trial, that the movant made a diligent yet unsuccessful effort to discover it. *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1524 (10th Cir.

1992). As the Plaintiff is proceeding *pro se*, the Court construes his pleadings liberally. A *pro se* plaintiff is entitled to liberal construction of his pleadings. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991).

### B. Appointment of counsel

Turning to the Plaintiff's specific arguments, the Court promptly rejects the contention that denying the Plaintiff's request for appointment of counsel constituted manifest error. A civil litigant has no inherent right to the appointment of counsel to represent him. *MacCuish v. United States*, 844 F.2d 733, 735-36 (10th Cir.1988). 29 U.S.C. § 1915(e)(1) provides that the Court may request that attorneys wishing to serve *pro bono* consider taking up the litigant's case, but the Court's decision to do so should be informed by several factors, including the merits of the claims, the nature of the factual and legal issues raised by the claims, and the litigant's ability to present the claims. *Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995). Here, the claims asserted by the Plaintiff at trial were neither legally nor factually complex. The sole legal issue – whether the Defendants violated the Plaintiff's 4th Amendment rights – turned entirely on a sole factual issue – whether the Defendants knocked and announced before entering the Plaintiff's home. Although the Plaintiff complains of lack of access to legal materials as a result of his incarceration, the Court observes that the matters at issue in this case required little, if any, legal analysis. The factual issue required only the presentation of testimony by percipient witnesses, essentially all of whom testified at trial, and all of whom were subject to direct or cross-examination by the Plaintiff as to their observations. Throughout the litigation, including trial, the Plaintiff's pleadings, motions, and presentation of the issues have been relatively straightforward and comprehensible, and the Plaintiff has demonstrated a command of all aspects of litigation that

exceeds that of most *pro se* litigants. Accordingly, the Court finds that the Plaintiff has been able to adequately represent himself, and that the denial of counsel did not result in any injustice, much less manifest injustice.

### C. Subpoenas

The Plaintiff's next issue concerns his inability to subpoena two witnesses. The Plaintiff contends that prison officials purposefully delayed his receipt of mail from the Clerk of the Court until after the trial ended, thereby depriving the Plaintiff of the ability to subpoena an investigator and a Denver police officer. The Court notes that the Plaintiff made a request to the Clerk of the Court on August 17, 2005 **(# 126)** requesting that the Clerk send him "forms[ ] so that I may get my witnesses to court on time." The record appears to indicate that blank subpoenas were by the Clerk on August 18, 2005. According to the Plaintiff, prison officials held that mail until September 1, 2005, after the trial had ended. The Plaintiff contends that, as a result of his inability to obtain subpoenas, he was unable to call two witnesses in his case.

The Court finds that the facts presented do not demonstrate manifest injustice. First, the Court notes that the Plaintiff never advised the Court during trial of his inability to subpoena the witnesses. On several occasions, the Court inquired as to whether the Plaintiff had any other evidence he wanted to present, and at no time did the Plaintiff advise the Court that there were witnesses he desired to present, but whom he had been unable to subpoena. The Plaintiff's complaint about the absence of the witnesses at this date, after the evidence has closed and judgment has been entered, is simply too late to preserve the issue for consideration.

Even assuming that the Plaintiff is correct and that prison officials improperly delayed the Clerk's mailing, there is no indication that the Plaintiff's case was actually prejudiced. The Court

notes that the Plaintiff has been proceeding in this matter *in forma pauperis* at all times **(# 6)**. As such, process and subpoenas on the Plaintiff's behalf are served not by the Plaintiff, but by the U.S. Marshal.  28 U.S.C. § 1915(d).  Even if he had received the Clerk's mailing on August 19, 2005, the Plaintiff almost certainly could not have served subpoenas himself at that time, as he lacked the funds to include a witness fee as required by Fed. R. Civ. P. 45(b)(1).  As an *in forma pauperis* litigant, the Plaintiff would instead have to complete the subpoenas, and then mail them to the U.S. Marshal for service.  Assuming the Plaintiff had done so promptly, the Marshal would have received the subpoenas for service no earlier than the next business day, August 22, 2005. The Court is not sanguine that, the Marshal would necessarily have been able to effectively serve the subpoenas in time to have the witnesses appear for trial eight days later.

Moreover, even if the Plaintiff had compelled the two witnesses to appear, there is no indication that their testimony would have materially altered the Court's view of the evidence. The Plaintiff identifies the two requested witnesses as Investigator David Neuss and Denver Police Officer Carlos Johnson.  The Court notes that, as of July 7, 2005, six weeks before trial, the Plaintiff did not know an address where Neuss could be found.  *See Docket* # 116, 117. Assuming that the Plaintiff had promptly received subpoenas for witnesses, there appears little chance that he could have secured Neuss' attendance at trial in any event.  Moreover, neither the Plaintiff's motion nor anything else in the record indicates what the Plaintiff expected Neuss to testify about, and the Court will not simply assume that Neuss' testimony, had he been presented at trial, would be both admissible and material.

By contrast, the Court has some idea of what the Plaintiff would have attempted to establish through Johnson.  At trial, during the examination of Defendant Burdhal, the Plaintiff

6

sought to introduce into evidence a transcript of testimony by Johnson from an unidentified proceeding. The Defendants objected to the introduction of this document, and the Plaintiff then made a proffer of the relevance of Johnson's testimony:

> The purpose, your Honor, to show inconsistency because amongst the police departments, the Denver S.W.A.T – different S.W.A.T. team methods of executing knock and announce warrants. Also a contradiction in the amount of time that it takes to forcibly – before they forcibly enter a person's home. . . This document as I said is relevant because it shows a clear inconsistency between what Sergeant Organ has testified to and what Sergeant Berdahl is testifying to now in that the known procedure of S.W.A.T. team is to bring a steel 20-pound pry bar to a person's residence to knock on the door with. This particular exhibit shows that that's not the proper procedure. They use a baseball bat in normal situations to knock on the door with, not a steel pry bar; so – but obviously I can't get it in, so I'll withdraw it.

The Court responded that it would treat the Plaintiff's representation as a proffer. By receiving the evidence of what Johnson would have testified to as a proffer, the Court was able to consider it as part of its analysis of the case. However, the proffered testimony of Johnson, even to the extent it impeached the testimony of the Defendants as to what was used to knock on the door, was of such marginal relevance to the fundamental issues of the case that live testimony by Johnson would not have altered the outcome of the case. Accordingly, the Court finds that any delay in the delivery of the Plaintiff's mail, even if it impaired his ability to subpoena witnesses, does not amount to manifest injustice warranting a new trial.

### D. Newly-discovered evidence

Next, the Plaintiff claims to have newly-discovered evidence. Specifically, he contends that he recently came into possession of a copy of a Supplemental Report by the Aurora Police Department concerning the events of June 15, 2001. The Plaintiff contends that this report

"clearly shows that all of the defense witnesses committed perjury on the witness stand. . . because they testified that they never entered the home through the front door." The document tendered by the Plaintiff, which is written and signed by Investigator Gary Valko states "Officers . . . made entry into residence the (sic) by breaching the front door and porting the front window of the residence after knocking and announcing the search warrant. Sergeant ORGAN advised that at 7:39 am , he personally began knocking on the front door of the residence and identifying himself . . . ."

Superficially, the Plaintiff's new evidence introduces a troubling inconsistency to the evidence received at trial. Throughout trial, the Defendants maintained that they knocked at and entered through the rear door of the Plaintiff's residence, and that nobody entered through the front door. The report, on the other hand, indicates that entry was made through the front door. Arguably, this new evidence might cast some doubt on the testimony of the Defendants. However, upon closer examination, the Court finds that the Plaintiff's new evidence does not warrant reconsideration of the evidence for several reasons. First, the Court observes that the new report is written by an officer of the Aurora Police Department. Neither that officer, nor the Aurora Police Department are Defendants in this case, and the authority upon which the Aurora Police Department made a report of the event is a matter of some question. Interestingly, the Aurora report incorporates by reference the Denver Police Department's After Action Report, which the Court received as an exhibit in this case, and which indicates that the "side door" was used to gain entry. The Denver report mentions the presence of a Gary Valco, a "Team Leader" on behalf of the Metro Gang Task Force, during a briefing 19 minutes prior to the execution of the warrant at the Plaintiff's house, but does not indicate that Valco/Valko (hereinafter "Valko")

8

was present at the Plaintiff's house for the actual execution of the warrant. None of the testimony at trial mentioned the presence of Valko at the time of the execution of the warrant, and the Aurora report does not purport to represent that its author was actually present when the warrant was served.

There are several possible explanations for the discrepancy between the two reports, none of which are so compelling that a new trial is warranted. Most likely, the Aurora report was prepared by Valko, despite not having been personally involved with the actual execution of the warrant. The contents of the Aurora report, particularly when read in conjunction with the Denver report, suggest that Valko, as leader of the Metro Gang Task Force, had a number of warrants to serve simultaneously, and enlisted the help of the Defendants to serve the warrant on the Plaintiff. Although Valko was not actually present for the execution of that warrant, he prepared a report for Aurora's records based upon information he received from others. (Note that the Aurora report also incorporates an FBI report by reference.) Whether Valko misunderstood what he was told by others as to which door was used, or whether he correctly recorded information he received (and whether such information came from one of the Defendants or others) that the front door was used for entry is a matter that cannot be resolved on the face of the documents.

Arguably, the Plaintiff could request that, in light of the disclosure of the Aurora report, he be permitted to reopen the case and subpoena Valko to clarify the situation. The Court notes that the Plaintiff has not made such a request, and, even if he had, the Court would deny it. Although the Plaintiff accuses the Defendants of withholding the Aurora report from discovery, there is no indication that the Defendants, all of whom are affiliated with the Denver Police

Department, had copies of the Aurora report in their possession to produce. The Plaintiff states that he obtained the Aurora report from a "confidential source," not the Defendants. In the absence of a showing that the Defendants had a copy of the Aurora report and purposefully withheld it from discovery, the Court is not inclined to reopen this case simply because the Plaintiff's post-trial efforts have unearthed information from other sources that he wished he had earlier.

In any event, even if the Aurora report itself had been produced at trial, the Court would still have reached the same conclusion. The unrebutted evidence from both sides in this case was that the side door was breached, a fact that is consistent with the Denver report written by Defendant Burdhal. Even assuming that one or more of the Defendants reported to Valko that they, in fact, breached the front door, such an admission might reflect careless reporting of the facts, a lapse of recollection at the time of that report, or even a mistaken recollection at the time of trial as to whether both doors were actually breached,[3] but any of these alternatives bear little on the credibility of the Defendants. Contrary to the Plaintiff's contention, even if the Aurora report is accurate, it does not compel the conclusion that the Defendants' testimony in this case was purposefully untrue. Finally, as discussed below, the Court's ruling turned less on the credibility of any of the Defendants, and more on the testimony by the Plaintiff's daughter. Thus, even if the Defendants' credibility could be somewhat impeached by the Aurora report, the Court would nevertheless have reached the same result. The Plaintiff's "newly-discovered evidence"

---

[3]In its oral ruling, the Court observed that in the parties' Final Pretrial Order, the Defendants admitted that two doors were damaged as a result of the event. Thus, the Court considered the fact that the Defendants' trial testimony was incorrect, and that entry occurred through both the front and rear door.

does not warrant a new trial.

### E. Interpretation of the evidence

Finally, the Plaintiff contends that the Court misconstrued the evidence. The Plaintiff takes issue with the Court's observation that the Plaintiff did not dispute that the Defendants waited some 12 to 18 seconds between knocking and their entry into the house. The Court understands the Plaintiff's chagrin at such a characterization, but it is nevertheless an accurate assessment of the evidence. The Plaintiff claims that he never heard a knock on the door, and thus, if the Court finds that a knock occurred, the Plaintiff's testimony cannot address how much time elapsed between that knock and the Defendants' entry. Thus, the question becomes whether there was a knock. The Defendants affirmatively assert that there was. The Plaintiff asserts that there was not, but he bases this assertion on the fact that he did not hear a knock. There is a saying that "absence of evidence is not evidence of absence." In other words, the fact that the Plaintiff did not hear a knock – and the undisputed evidence was that two televisions were playing in the house and the Plaintiff's wife had just finished taking a shower at the time – does not necessarily mean that there was no knock. In some circumstances – say, in an otherwise quiet house – testimony that one did not hear knocking before someone enters might be persuasive evidence that no knock actually occurred. But here, where there is unrebutted evidence of several other sources of noise in the house at the time the knocking occurred, the Court is simply not persuaded that the Plaintiff's (and his family's) failure to hear a knock necessarily establishes that the Defendants did not actually knock.

The Court also rejects the Plaintiff's contention that it misunderstood his testimony because of defects in the video link. Although there were some problems with proper audio

transmission at the beginning of the trial, and very sporadic instances of a speaker being too far from the microphone at other times, the audio transmission throughout the trial was otherwise completely clear and comprehensible.  The record reflects that on the few occasions when the Court could not hear the Plaintiff clearly, the Court asked him to repeat himself.  On three separate occasions – once on his direct examination and twice in response to a question on cross-examination– the Plaintiff testified to the same thing: that he heard a "very loud noise, a continuous loud noise, shattering of glass and so forth and they stormed into my bedroom."  The Plaintiff testified that this "continuous noise" was "a loud noise, shattering of glass and so forth and they stormed into my bedroom," and "glass being broken, bamming like the doors being knocked off the hinges, storming.  The whole house was vibrating."  The Plaintiff testified that the noise lasted 3 - 5 seconds.  In its oral ruling, the Court observed that the Plaintiff testified that "Mr. Hall and his daughter recall hearing noise before the officers entered.  The plaintiff describes it as a continuous noise . . . ."

The Court's characterization of the evidence is entirely consistent with the Plaintiff's testimony, except arguably with regard to the word "entered."  The Plaintiff's testimony was that the noise occurred before the Defendants entered his bedroom.  The Court's oral ruling may give the impression that the Court understood the Plaintiff's testimony to be that the noise occurred before the Defendants entered his house.  Assuming that the Court understood the Plaintiff's testimony to be that the "continuous noise" preceded the Defendants' entry into the house, the Court is not convinced, having had the opportunity to observe the manner and tone of the Plaintiff's testimony – characteristics not reflected in the cold transcription – that this is an erroneous inference to be drawn from his initial testimony.  In any event, even if the Court did

misconstrue the Plaintiff's testimony, the Court nevertheless finds that the testimony of the Plaintiff's daughter is sufficient, on its own, to support the Court's conclusion. The daughter's testimony was quite clear that there was "yelling and noise" outside the door before the Defendants entered. The daughter's testimony was credible, and the Court would find it alone to be sufficient to establish that the Defendants knocked and announced before entering.

## **CONCLUSION**

Accordingly, the Court finds no manifest injustice arising from any of the grounds argued by the Plaintiff. The Plaintiff's Motion for New Trial **(# 138)** is **DENIED**. The Plaintiff's Motion for Order Granting New Trial **(# 145)** is **DENIED**. The Clerk of the Court is directed to close this case.

Dated this 15th day of June, 2006

                                                 **BY THE COURT:**

                                                 Marcia S. Krieger
                                                 United States District Judge